UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CHARLES E. MARSALA                    *        CIVIL ACTION

versus                                *        NO. 06-3846

JERRY L. MAYO, JAY T. LANNERS,        *        SECTION "F"
and PROFITABLE DINING, LLC

<u>ORDER AND REASONS</u>

Before the Court are three motions:  (i)  Mayo's motion to
amend answer; (ii) Mayo's motion for summary judgment; and (iii)
Lanners' and Profitable Dining's motion for summary judgment.

For the reasons that follow, (i) Mayo's motion to amend answer
is GRANTED; (ii) Mayo's motion for summary judgment is GRANTED in
part and DENIED in part; and (iii) Lanners' and Profitable Dining's
motion for summary judgment is GRANTED in part and DENIED in part.

<u>Background</u>

This bitter story of unfulfilled financial expectations and
lost friendship is driven by a history of intricate alleged facts.

Charles Marsala invested in restaurant franchises with a close
friend, Jerry Mayo, and an acquaintance, Jay Lanners.  The venture
failed, money, to one extent or another, was lost by all partners,
and a long-term friendship sadly ended.  Eventually, Marsala sued
his former friend and the acquaintance for fraud, breach of
fiduciary duty, and contribution; he also sued the company,
Profitable Dining, to recover an unspecified amount under a

1

promissory note.

In 1974, Charles Marsala and Jerry Mayo were fellow boy scouts.  Four years later, they were Delta Tau Delta fraternity brothers at Tulane.  During the course of a close friendship that spanned over twenty years, they decided to enter the business venture that is at the center of their present hostility.  A few years after that, the venture had failed, a friendship had ended, and on July 21, 2007, Marsala sued Jerry Mayo and their business partner, Jay Lanners, as well as the company they had formed, Profitable Dining.  Marsala asserts claims against Mayo and Lanners for fraud and breach of fiduciary duty.  (He has since withdrawn his contribution claim against Lanners.)  He also asserts a claim on a promissory note claim against Profitable Dining.  Here is a summary of the many events leading to this emotional litigation.

At some point in 1995 or 1996, during the course of their close friendship, Marsala and Mayo had done business together. They had purchased two Dun and Bradstreet Receivable Management Franchises, with each putting in $40,000.  Mayo was a silent partner.  Throughout the course of a year, Mayo even permitted Marsala to make business purchases on his credit card totaling $200,000 (over the course of a year, monthly average purchases were as much as $10,000, and were paid off monthly).

Meanwhile, also in 1996, Mayo separately became involved in Copeland's Famous New Orleans Restaurant and Bar franchises.  When

presented with an opportunity to invest in the franchises with another Tulane fraternity brother and others, Mayo formed a company called Garden District Investments in order to open six Copeland's franchises in Tennessee and the Carolinas.  Not long after, Mayo was also involved in the formation of a second company called SCIBMATT, LLC to open even more Copeland's franchises in Atlanta. Lanners owned 5% of SCIBMATT.

Around this same time, Mayo and Lanners, who knew each other,[1] formed companies that owned and developed the real estate and facilities for the Copeland's restaurants in Knoxville, Tennessee and Pineville, North Carolina.

In January 1998, Mayo and Marsala, still close friends, found themselves sharing a house together in New Orleans.  Mayo was staying in New Orleans working on a telecom business; Marsala was there following a divorce, deciding whether he wanted to relocate from California.

While jogging and sharing meals, Mayo -- who was at this point actively involved in his personal investments in Copeland's franchises -- discussed his Copeland's investments with Marsala. He showed Marsala the weekly profits generated from the Knoxville restaurant.  Marsala was impressed; he said he would like to invest if the opportunity arose.  It did.

---

[1] Mayo and Lanners met after college when they worked at AT&T.

In March 1998, Mayo told Marsala that he and Lanners planned to form a new company, Profitable Dining, LLC, to buy and operate still more Copeland's franchises. Mayo offered Marsala the opportunity to invest. (Marsala knew Lanners socially; when Lanners went with Mayo to the 1984 Olympics, they stayed with Marsala; Lanners and Marsala also went diving together occasionally in Santa Monica). Marsala says, at some point during various discussions with Mayo, Mayo assured Marsala that Marsala would be a passive investor with no other obligations, that the new company would be properly capitalized, and that it would follow the format of previous Copeland's franchises that Mayo had started.

Before signing the Profitable Dining Operating Agreement, Marsala did little independent investigation of his own into his investment. Marsala met with Bill Copeland, the president of the franchisor. Marsala and Copeland tasted some Copeland's dishes and looked at a food preparation facility. Marsala knew that Copeland's had been successful in New Orleans for twenty years, that Mayo was very high on the Copeland's franchise operation, and that he planned on opening 20 restaurants. Marsala asked Mayo what would happen if a problem arose at one of the restaurants; Mayo assured him that Lanners was responsible for taking care of things. Mayo told Marsala that Lanners had remarked that "there's no way you can lose with...the Copeland's"; but Lanners himself never said that to Marsala.

4

Marsala estimated it would cost $600,000 to open a Copeland's franchise and he claims that he thought he was putting in one-third of the initial capital.[2]  Lanners and Marsala met for lunch at Casa di Palermo in Metairie, at which time Marsala assured Lanners he would live up to his $200,000 commitment.  Lanners did not tell Marsala that he would be putting up $200,000 too.  Indeed, Marsala admits that, at some point, Mayo had told him that Lanners would receive sweat equity in Profitable Dining in return for developing the restaurant site and overseeing its construction.

Presumably because of the relationship among the three, there was only one written communication between Lanners and Marsala before Marsala invested in Profitable Dining.  On April 23, 1998, Lanners sent a copy of the Profitable Dining Operating Agreement to Marsala and Mayo for their signatures.  The cover letter accompanying the Agreement, which was addressed to Mayo and

---

[2] Marsala had assumed, though he was not told by Mayo or Lanners, that Mayo and Lanners would be putting in $200,000. Marsala assumed that Profitable Dining would follow the earlier business plan of Garden District Investments, though he admits he has never seen a written version of the plan or agreement for GDI. He asserts that Mayo told him that GDI had required $600,000 in capital from its partners at the outset, with the remainder owed by the managing member and reflected in a promissory note.  Mayo also advised that SCIBMATT required $400,000 in initial capital, with the remainder owed by the managing member and, again, reflected in a promissory note.  Further, Marsala says that on the day the Profitable Dining Operating Agreement was signed, he did ask Mayo when he and Lanners would be putting their money into Profitable Dining and Mayo responded that Mayo as General Manager would receive a capital credit of $100,000 and that Mayo would get a $100,000 credit if he got Copeland's to waive a franchise fee.

Marsala, provided:

> Gents,
>
> Enclosed please find three original Operating Agreements for our forthcoming venture. Please review them and provide commentary. Should you deem them feasible as they are, please sign all three copies, retain one set for your own records and mail one set to me along with a check for $200,000 made payable to Profitable Dining, LLC.
>
> Jerry [Mayo], this agreement is the same operating agreement we used for SCIBMATT[3] with the following exceptions:
>
> 1.  I am the Managing member by virtue of a 2/3 vote of the members [as opposed to an unconditional Managing Member],
> 2.  I removed article 17 which gave me unlimited eternal control as your "attorney-in-fact" [whatever that is].
>
> As with any situation, you will be served by retaining your own attorney to review this document and provide commentary.
>
> Once I've received the check, I will open an interest bearing account in the company's name. I do not foresee any material forthcoming costs with the exception of our $100 incorporation fee and the corresponding $80 registered agent fee.
>
> Look forward to doing business together and will work diligently to maintain your passive and profitable roles.
>
> Sincerely,
>
> Jay Lanners
> Managing Member

---

[3] Marsala took this to mean that each of them were investing equally (but he never told Mayo or Lanners of his understanding).

Marsala, Lanners, and Mayo all signed the Agreement in April, 1998. The Agreement designated Lanners as managing member and provided that the three investors had the following interests: Jay Lanners, 43.75%; Jerry Mayo, 43.75%; and Charles Marsala, 12.50%.

The Agreement provided that Profitable Dining would be a Delaware LLC with its principal office in Georgia. A choice-of-law provision designated Georgia law to govern: "This Agreement and the rights and liabilities of the parties hereunder shall be determined in accordance with the laws of Georgia."

Addressing personal guarantees, the Agreement provided that "[t]he Members shall not be obligated to guarantee Company indebtedness unless the Member agree[s] to do so."

Paragraph 9.5 limited the Managing Member's liability:

> The Managing Member shall not incur any liability to the Company or any other Member for any mistakes or errors in judgment or for any act or omission believed by the Managing Member in good faith to be within the scope of authority conferred upon him by this Agreement...; provided, however, that the Managing Member may be liable for any losses, costs or damages resulting from conduct...amounting to fraud, dishonesty, willful neglect of duty, gross negligence, or a breach of fiduciary duty to the other Members.

The Agreement also contained a merger clause, which provided:

> 15.8 Entire Agreement. This Operating Agreement embodies the entire agreement and understanding between the Members with respect to the subject matter hereof, and supersedes all prior agreements and understandings

7

> between such members relating to the subject
> matter hereof....

On May 5, 1998, Marsala deposited at least $160,000 of his $200,000 investment. Later, he invested the additional $40,000. At various points, Lanners is said to have loaned money to Profitable Dining.[4]

By June 1998, Lanners apparently had loaned the $200,000, that Mayo paid in, to A&S Recovery, a business run by one Cindy Grey, whose husband was a member of SCIBMATT. (Lanners' insinuation in this story is extensive; recall here that he has a 5% ownership interest in SCIBMATT). The loan proceeds were available to SCIBMATT. The loan called for an interest rate of 10% and a 10-day call notice. A&S Recovery repaid the loan in full on August 18, 1999. (By making the loan, Lanners temporarily managed to get a premium return on Profitable Dining's cash.)

In October 1998, Marsala was provided with a Profitable Dining business plan. That plan provided optimistically that the Partnership Objective was:

> To establish and operate six Copeland's of New
> Orleans Restaurants under the following
> guidelines:

---

[4]  But Marsala contends that Lanners loaned the company nearly $400,000 for 24 hours while he had an accounting firm prepare a year end statement reflecting those funds on the company's books. Lanners withdrew the money the next day but did not change the report. Lanners could be at risk in this litigation, if the jury finds the evidence supports Marsala's serious point.

1.  Beyond the initial capital investment, no
    capital calls to the partners should be
    required unless there is a dire
    emergency[.]

2.  Partners will receive no distributions
    until the sixth restaurant is operational
    with the exception of reasonable
    distributions of cash to cover tax
    burdens created by income from the
    partnership.

3.  **By the end of the first year of operation
    of the sixth restaurant, investment
    partners should receive at least 100% of
    their initial investment as a
    distribution.**

....  (emphasis added).

Also in the fall of 1998, Mayo asked Marsala and Lanners for permission to transfer four percent of his ownership interest in Profitable Dining to his brother, Jeff.  Lanners and Marsala executed the First Amendment to the Operating Agreement, approving the transfer on November 28, 1998.

In December 1998, Profitable Dining's December 31, 1998 Compilation Report drew attention to the investors of the company's Statement of Assets, Liabilities and Capital and Statement of Revenues, Expenses, and Partners' Capital.  It, perhaps misleadingly, showed that the company had $395,687.[5]  It also provided, as Schedule 1, an Analysis of Partners' Capital Accounts, showing that Jay Lanners and Jerry Mayo had contributed nothing,

_____

[5] The report did not reveal that, on December 30, 1998, another Lanners company had loaned Profitable Dining $395,000; that loan, save $1000, was repaid the next day.  Therefore, Profitable Dining did not have $395,687 on deposit on December 31, 1998.

9

while Charles Marsala had contributed $200,000.

By December 1999, the Tampa restaurant opened.[6]  Profitable Dining had negotiated an initial franchise development agreement with Copeland's and a lease and franchise agreement for the Tampa restaurant.  Lanners, Mayo, and Marsala all personally guaranteed that franchise agreement lease with the landlord, Primax Properties, LLC, and an equipment loan from GE Capital.  A few months later, Profitable Dining opened its Winston-Salem location on April 10, 2000 and its Jacksonville location on April 4, 2001.[7]  Lanners, Mayo, and Marsala again personally guaranteed the franchise agreements.  Marsala did not personally guarantee the lease for Winston-Salem or Jacksonville; but he guaranteed the equipment loans in favor of GE Capital for Tampa and Jacksonville.[8]

---

[6] This restaurant always operated at a loss and eventually closed.

[7] Also during this time, the Profitable Dining appetite continued and it acquired other restaurants.  Marsala contends that the circumstances of these acquisitions constitute self-dealing: In 2000, GDI (a company owned in part by Mayo) owned several other struggling Copeland's franchises.  Mayo offered to let Profitable Dining acquire GDI's Winston-Salem restaurant and two in Charlotte.  Winston-Salem, which had been mid-construction when purchased, opened on April 10, 2000.  Profitable Dining did not acquire any of the liabilities of the two Charlotte restaurants, neither of which had done well and in fact were about to close.  Profitable Dining tried to turn the restaurants around.

[8] Marsala contends that Lanners told him that all equity owners were asked to sign guarantees of their ownership interest and that if he didn't sign the guarantees, he would lose his investment.  Further, Marsala said he had been assured that he should not worry about it because Lanners and Mayo had a combined net worth of several million dollars and, if the guarantees were

Lanners, through one of his companies, loaned money to Profitable Dining for the start-up costs.  He was repaid some unknown, and disputed, portion of the money he provided.

In late November 2000, the three members executed an Amendment for Adjustment of Membership Interest: Mayo reduced his Profitable Dining interest in the company from 44.75% to 7.7%; Jay Lanners' membership interest was increased accordingly and his new interest was 79.8%.  Marsala approved the transfer by signing Agreements for Adjustment of Membership Interests.[9]  Just one month later, another Agreement for Adjustment of Membership Interest was executed by the three.   This time, Mayo forfeited his portion of membership interest, which Lanners gained.   Lanners now had 87.5% of Profitable Dining.

On May 10, 2001, Profitable Dining held a partners meeting to discuss the company's performance and projections.  Among other things, the handout from the meeting alerted Marsala that financial expectations were not being met[10] and that the franchisor was

_____

enforced, they would be the likely targets.

[9] Marsala contends that he did not then know that Lanners and Mayo had fraudulently plotted to transfer Mayo's Profitable Dining assets.

[10] For example, a positive cash flow had been projected for the Tampa restaurant, but it had lost $170,000; the Jacksonville restaurant was meeting expectations, but Winston-Salem was not; Pineville was showing a negative net income.

revealing some shortcomings.[11]

Profitable Dining desperately needed cash.  So Marsala loaned the company $250,000.  Pursuant to a Promissory Note dated August 1, 2001, Profitable Dining promised to pay Marsala $250,000 plus interest for money loaned.[12]  Events turned bad quickly.

In February 2003, Mayo filed for bankruptcy.  (Marsala says he only learned of the bankruptcy in 2004.)[13]

On February 14, 2003, Lanners sent Marsala a letter "as a note of explanation as it pertains to the money paid to you last year from Profitable Dining":

> [Y]ou were paid $90000.00 in 2002.  Our accounting firm has agreed that these payments

---

[11]  Marsala acknowledges that he was at the meeting but did no independent analysis of what was discussed.  He now states that "the packet Lanners handed out still showed that Profitable Dining was still on pace to deliver 100% on Marsala's investment."

[12]  Marsala's "best recollection" is that, at various times, he has loaned Profitable Dining $364,000.  He says he loaned Profitable Dining $102,000 on January 23, 2001 and $60,000 on March 1, 2001. In support of his recollection, he submits a copy of a check from him to the company dated March 30, 2001 for $90,000, a December 19, 2001 check for $112,000, an illegible check that plaintiff asserts is for $102,000, and a statement activity from his Washington Mutual Account, showing a "DDS advance" on March 1, 2003 of $60,000.  Obviously, the credibility of this kind of evidence will be of no small significance at trial.

[13]  Marsala asserts that he has learned in the course of discovery that Lanners and Mayo schemed to remove assets from Mayo in anticipation of his bankruptcy.  Marsala says that the "gentleman's agreements" between Lanners and Mayo were not disclosed to him; rather, it was represented only that Mayo could not meet a capital call so his shares would revert to Lanners, who could meet the call.  It seems the fingerprints of Lanners are everywhere.

should be classified as an "owner's distribution" to you. In doing so, you will not receive a 1099. In addition, you will not have to declare the payments as taxable income.

It is my expectation that you will see an increase in 2003-again-it will not be creating a 1099.

Should you find a need for "2002 income verification" for any of you[r] future business dealings, I will be happy to have Lisa forward cancelled checks to verify money paid to you.

On March 20, 2003, Profitable Dining's Chief Financial Officer, Lisa Romine, also sent Marsala a letter "for your records as to what Profitable Dining paid you in 2001: 3 Payments of $700.00 interest[,] 4 payments of $10000.00[,] 1 Payment of $122500.00[.] Total: 164600.00[.]"[14]

To try to deal with the financial distress, Lanners negotiated a $700,000 bail-out loan from Profitable Dining's landlord, Primax, in August 2003. The purpose of the loan was to aid Profitable Dining to get current on its outstanding and overdue obligations. Proceeds of the loan were used to pay past due rent, property taxes, and other past due bills. Part of the loan was secured by guaranties of Profitable Dining of Tampa, of Jacksonville, and of Winston-Salem. Primax asked Lanners and Marsala to personally

---

[14] Profitable Dining's position is that this correspondence shows that it had repaid $254,600 to Marsala by March, 2003. Marsala's response is at best unresponsive and self-serving.

guarantee the loan.  Lanners did, but Marsala did not.  As part of the loan transaction, Profitable Dining furnished an additional $140,000 to meet its then-existing debt obligations.

By June 2003, Profitable Dining was, by admission, in default under the loan agreement with Primax.  By July 16, 2004, Primax gave notice of default under the loan agreement.  And, by August 6, 2004, Primax began exercising its rights under the various agreements with Profitable Dining in order to purchase certain assets of Profitable Dining and its subsidiaries.[15]

In September 2003, Lanners had told Marsala that he would buy him out.  Months later, on January 13, 2004, Lanners exercised his buy/sell rights under the Operating Agreement; Marsala executed an Assignment of Membership Interest in favor of Lanners.  That same day, Lanners having redeemed Marsala's entire ownership interest in Profitable Dining, Primax released Marsala of his guaranty obligations.  (To date, Primax has not released Lanners from the guaranty agreements related to the various Profitable Dining leases, or to the $700,000 loan).  On January 14, 2004, Lanners entered into an Escrow Agreement with a firm called Womble Carlyle Sandridge & Rice, appointing the latter as Escrow Agent in accordance with his agreement that he purchase Marsala's membership

---

[15] Lanners contends that Profitable Dining "went out of business" at this time.  Profitable Dining and its subsidiaries were formally dissolved by the Delaware Secretary of State on March 3, 2006.

14

interest in Profitable Dining for $36,750 plus the forgiveness of any all personal guaranties of Marsala in favor of Primax.[16]

On January 13, 2005, after receiving a voicemail message from Lanners advising him to do so, Marsala cashed the $36,750 check that Lanners had written him to buy him out a year before.

Profitable Dining and its subsidiaries were formally dissolved by the Delaware Secretary of State on March 3, 2006.

And so, on July 21, 2006, Charles Marsala sued Jerry Mayo, Jay Lanners, and Profitable Dining.  He asserts claims for fraud, breach of fiduciary duty, and contribution against Mayo and Lanners.  He asserts a claim against Profitable Dining for amounts due under the August 1, 2001 promissory note.

All three defendants now move for summary judgment.  Also, Mayo, *pro se*, asks the Court to permit him to amend his answer to include three more defenses: statute of limitations, discharge of claims in bankruptcy, and failure to state a claim.

---

[16] The parties dispute whether this was due to a cash infusion by Lanners.  Lanners says he put an additional $203,333.01 into the company in exchange for Primax forgiving Marsala's personal guarantee of the Tampa lease.  Marsala believes that the Tampa lease in any event did not expose him because it was subsequently leased to a Wild Wings restaurant by Primax.  The parties also dispute the extent of each other's cooperation regarding the Primax deal that ultimately resulted in a personal guarantee by Lanners but not Marsala.

I.   <u>Standard for Amendment of Pleadings</u>

Jerry Mayo, *pro se*, seeks to amend his Answer to include three affirmative defenses:  (1) plaintiff's claims are all barred by a discharge granted to Mayo in a Chapter 7 bankruptcy case; (2) plaintiff's claims are barred by the statute of limitations; and (3) plaintiff's claims are barred by his failure to state a claim upon which relief may be granted.

In support of his motion, Mayo contends that, in preparing for his deposition which was given on September 25, 2007, he first learned that these defenses must be stated in his Answer.  (He retained counsel solely for his deposition and his lawyer then advised him of this requirement).  He points out that there is no prejudice to plaintiff because the defenses do not require any, or very little, discovery.   He says he provided a copy of his bankruptcy discharge to plaintiff's counsel on September 24, 2007 so he could question him about it during his deposition.   Finally, Mayo points out that discovery has not closed.[17]

Marsala opposes the requested amendment on the ground that the request comes eight months after the cut-off period.  (Amendments to pleadings were due March 1; trial is set for November 13).  He concedes that *pro se* litigants are entitled to have their pleadings

_____

[17] The plaintiff filed a motion to continue trial and extend deadlines; on September 19, 2007, the Court denied the motion to continue the trial but ruled that  "the Court will allow discovery to continue until the date of the final pretrial conference."

and papers liberally interpreted but urges that the law should extend this indulgence no further and certainly not so far as to permit pleadings to be filed so long after they are due and six weeks prior to trial.

At this point in the litigation, Federal Rule of Civil Procedure 15(a) permits Mayo's proposed amendment to his Answer "only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Factors the Court may consider in determining whether to permit late amendment include: (1) undue delay, (2) undue prejudice to the nonmoving party, (3) whether the movant is in bad faith or has dilatory motive, (4) judicial economy, and (5) the amendment's relevance to the original action and merits of the case. See Chitimacha Tribe of Louisiana v. Harry L. Laws Co., 690 F.2d 1157 (5th Cir. 1982).

Considering these factors, under the circumstances, the Court finds that justice requires that Mayo be permitted to amend his Answer and pursue his affirmative defenses at trial for whatever they are worth. However, in fairness to the plaintiff, the Court will not consider the merits of the newly-added defenses on summary judgment.

## II. Standard for Summary Judgment

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine issue as to

any material fact such that the moving party is entitled to judgment as a matter of law.  No genuine issue of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio., 475 U.S. 574, 586 (1986).  A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion.  See id.  Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate.  Id. at 249-50 (citations omitted).  Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party.  See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992).  Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims.  Id.  Hearsay evidence and unsworn documents do not qualify as competent opposing evidence.  Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987).  Finally, in evaluating the summary judgment motion, the Court must read the

18

facts in the light most favorable to the non-moving party. Anderson, 477 U.S. at 255.

### III.   Choice of Law

The Court has diversity jurisdiction under 28 U.S.C. § 1332.[18]

In diversity cases, the Court must follow the choice of law rules of the forum state. See Cherokee Pump & Equip., Inc. v. Aurora Pump, 38 F.3d 246, 250 (5th Cir. 1994). Accordingly, the Court applies Louisiana's choice-of-law principles to determine what law applies in this diversity case.

Under Louisiana law, tort claims such as fraud and breach of fiduciary duty are governed by the "law of the state whose policies would be most seriously impaired if its law were not applied." La. Civ. code art. 3542.[19] To make this determination, the Court must evaluate the strength and pertinence of the relevant policies of

---

[18] The parties are completely diverse: Charles Marsala is domiciled in California. Jerry Mayo is domiciled in New Jersey, Jay Lanners is domiciled in Georgia, and Profitable Dining is incorporated in Delaware with its principal place of business in Georgia.

[19] The plaintiff assumes, without analysis, that Georgia law applies because the parties chose Georgia law in the Agreement. Under Louisiana law, contracting parties are free to choose which state's law governs disputes arising out of their contracts; those choice of law provisions are presumptively valid. See La.C.C.art. 3540, which instructs: "[a]ll other issues of conventional obligations are governed by the law expressly chosen...by the parties, except to the extent that law contravenes the public policy of the state whose law would otherwise be applicable under Article 3537." Marsala's claims are tort claims. Therefore, while a factor in the analysis, the parties' choice of Georgia law is not necessarily dispositive, but helpful.

the involved states in the light of:

> [1]   the pertinent contacts of each state to
> the parties and the events giving rise to
> the dispute, including the place of
> conduct and injury, the domicile,
> habitual residence, or place of business
> of the parties, an the state in which the
> relationship, if any, between the parties
> was centered[; and]
>
> [2]   the policies and needs of the
> interstate...systems, including the
> policies of:
>
>> [a]  upholding the justified expectations
>> of the parties;
>> [b]  minimizing the adverse consequences
>> that might follow from subjecting a
>> party to the law of more than one
>> state;
>> [c]  deterring wrongful conduct; and
>> [d]  repairing the consequences of
>> injurious acts.

La.Civ.Code art. 3542; La.Civ.Code art. 3515.

The parties do not dispute that Georgia law applies. The Court agrees: in addition to the fact that Profitable Dining had its principal place of business in Georgia, another key defendant, Lanners, is a Georgia domiciliary. Application of Georgia law upholds the expectations of the parties, given the parties choice-of-law clause in the Profitable Dining Operating Agreement. The parties' contacts with other states are fleeting and otherwise insignificant in comparison. A few meetings took place in New Orleans, but, otherwise, the parties have no connection to Louisiana, aside from attending college here.

IV. <u>Breach of Fiduciary Duty Claims</u>

While the parties otherwise agree that Georgia law governs Marsala's claims, defendants contend that Georgia law calls for the application of Delaware law to Marsala's breach of fiduciary duty claims.  The Court also agrees.

Georgia law is clear:  the state is forbidden from regulating a foreign corporation's organization or internal affairs.  Ga. Code Ann. § 14-2-1505(c).  This is the so-called "internal affairs doctrine", which has been described as "...involved whenever the issue concerns the relations inter se of the corporation, its shareholders, directors, officers or agents..."  <u>See</u> <u>Diedrich v. Miller & Meier & Assocs.</u>, 154 Ga. 734, 334 S.E.2d 308 (1985) (citing Restatement (Second) Conflicts of Laws § 313).

Ga. Code Ann. § 14-11-701 provides that:

> The laws of the jurisdiction under which a
> foreign limited liability company is organized
> govern its organization and internal affairs
> and the liability of its managers, members,
> and other owners....

In other words, Georgia law calls for the application of the local law under which a company is organized (here, Delaware) to claims concerning the internal affairs of the company.  <u>Cf.</u> <u>Looney v. M-Squared, Inc.</u>, 262 Ga.App. 499, 586 S.E.2d 44 (2003) (noting that parties agreed that place of incorporation applied to claims for breach of fiduciary duty).

21

Application of Georgia's internal affairs doctrine mandates that this Court apply Delaware law to Marsala's breach of fiduciary duty claims.

A fiduciary owes a duty of loyalty and care, including the duty to not knowingly mislead.  Metro Communication Corp. BVI v. Advanced Mobilecomm Technologies, Inc., 854 A.2d 121, 153 (Del.Ch. 2004).  Delaware requires a fiduciary to speak up if he learns that a statement he made earlier was false or misleading.  Id.  "[T]he mere possession of material facts," however, "does not give rise to a duty to disclose those facts....  Even fiduciaries have 'no distinctive state law duty to disclose material developments with respect to the company's business' in the absence of a request for stockholder action...'"  Id. (citation omitted).

The parties do not dispute that Lanners owed a fiduciary duty after the execution of the Agreement.  Whether he breached that duty must await trial.  Disputed issues of material fact make summary judgment on Marsala's breach of fiduciary duty claim inappropriate.[20]

## V.  Fraud Claims

### A.

The parties and the Court agree that Georgia law applies to plaintiff's fraud claims.

---

[20] The Court notes that Mayo did not address in his brief the plaintiff's claims for breach of fiduciary duty; he simply adopted the arguments of Lanners when he submitted his reply brief.

Ga. Code Ann. § 51-6-2 provides:

> (a)  Willful misrepresentation of a material fact, made to induce another to act, upon which such person acts to his injury, will give him a right of action.  Mere concealment of a material fact, unless done in such a manner as to deceive and mislead, will not support an action.

> (b)  In all cases of deceit, knowledge of the falsehood constitutes an essential element of the tort.  A fraudulent or reckless representation of facts as true when they are not, if intended to deceive, is equivalent to a knowledge of their falsehood even if the party making the representation does not know that such facts are false.

In other words, to prove fraud, the plaintiff must show (1) a false representation, (2) scienter, (3) intent to induce the party to act or refrain from acting, (4) justifiable reliance, and (5) damages.  See Almond v. McCranie, 283 Ga.App. 887, 889, 643 S.E.2d 535 (2007).  When parties put their agreement in writing, and that agreement contains a merger clause

> prior or contemporaneous representations that contradict the written contract cannot be used to vary the terms of a valid written agreement pruporting to contain the entire agreement of the parties, nor would the violation of any such alleged oral agreement amount to actionable fraud.

See Alimenta (USA), Inc. v. Oil Seed South, LLC, 276 Ga.App. 62, 65, 622 S.E.2d 363 (2005) (citations omitted).

As noted earlier, the Profitable Dining Operating Agreement contained a merger clause, which provided:

23

> 15.8 Entire Agreement. This Operating Agreement embodies the entire agreement and understanding between the Members with respect to the subject matter hereof, and supersedes all prior agreements and understandings between such members relating to the subject matter hereof....

Applying Georgia law to this provision bars Marsala's claims for fraud based on claims of pre-Operating Agreement misrepresentations. Accordingly, the alleged representations that Marsala claims occurred before executing the Operating Agreement, that each member would make an initial capital contribution of $200,000, are not actionable as a matter of Georgia law in light of the merger clause.[21] See Estate of Sam Farkas, Inc. v. Clark, 238 Ga.App. 115, 517 S.E.2d 826 (1999) (when there is a merger clause, a party must choose between affirming the contract and suing for breach, or rescinding the contract and suing for fraud; a merger clause prevents the recovery of a party who has not rescinded the contract but sues in tort). Marsala's arguments that the merger agreement is ineffective are without merit.

### B.

Most of Marsala's other assertions of fraud are murky and conclusory at best. The Court does its best to analyze each in turn.

Marsala charges that the "failure to adequately capitalize

---

[21] Lanners also suggests that any statements made before the Operating Agreement was signed are actually promises of future events, not misstatements of existing fact.

Profitable Dining, necessitating personal guarantees from the plaintiff" constitutes fraud.  As outlined above, Georgia law disagrees.  Lanners correctly notes that, even if it is true that Profitable Dining was not adequately capitalized, Marsala fails to allege in this instance the first and simple element of a fraud claim, a "representation" that was false.

Marsala also asserts that the stated objective that all investors would receive a 100% return on the investment amounts to fraud.  This merely hopeful objective was part of the Profitable Dining business plan distributed in October 1998; the portion regarding the 100% return provided: "By the end of the first year of operation of the sixth restaurant, investment partners should receive at least 100% of their initial investment as a distribution."  Accordingly, even if this is characterized as a guarantee that investors would receive a 100% return, which is a perversion of the plain text, it was clearly subject to the contingency all six restaurants were operational.  This statement can only rationally be taken as merely an objective, a hope, of the Plan.  Generally, "fraud cannot be predicated on statements which are in the nature of promises as to future events."  See BTL COM, Ltd. v. Vachon, 278 Ga.App. 256, 258, 628 S.E.2d 690 (2006) (citation omitted).

However, Marsala adds that the defendants told him that they were worth millions, in an attempt to induce Marsala into signing

personal guarantees, outside the Operating Agreement. Marsala's assertion is not specific and the record shows that he signed some personal guarantees but not others. Lanners counters that if the statement was made in 1999 in connection with the Tampa personal guarantees, it was true. It becomes here central to note that Marsala made no attempt to independently verify the defendants' net worth. Under Georgia law, one who fails to investigate or use ordinary care to verify a statement made by another may not recover even if fraud is later proven. See Hannah v. Belger, 436 F.2d 96, 98-99 (5th Cir. 1971). His casual conduct could well substantially weaken this claim at trial. However, the defendants' contention that, if the statement was made, it was probably true is patently insufficient, because there is no support on this record for that assertion either. Accordingly, Marsala's claim that defendants misrepresented their net worth to induce him into signing personal guarantees survives as implicating material issues of fact.

Marsala also concludes that the defendants' failure to tell him about the A&S recovery loan amounts to fraud. The defendants insist that this act or omission was not done to induce the plaintiff to act or refrain from acting. What is more convincing, however, is that Marsala simply does not dispute the defendants' contention that the loan was repaid with interest. Because Marsala fails to show how he was injured from the defendants' failure to disclose (assuming there was such a duty), his fraud claim on this

ground fails.  See Looney v. M-SQUARED, Inc., 262 Ga.App. 499, 504, 586 S.E.2d 44, 49 (Ga.App. 2003).

The defendants' motions for summary judgment on Marsala's fraud claims are GRANTED in part and DENIED in part.

## VI. Claim Under the Promissory Note

Finally, Marsala asserts a claim for repayment of loans made to Profitable Dining, which were secured by a promissory note. Marsala asserts that Profitable Dining "has not made complete principal payments in accordance with the terms and conditions of the note, and is therefore in breach of its repayment obligations under the terms of the note." Profitable Dining counters that it repaid Marsala.  Marsala does not dispute that he was paid some money, but vaguely suggests that he is still owed more.

The August 1, 2001 Promissory Note itself provides that it is governed by Georgia law.  To collect on a promissory note, "the plaintiff creditor must prove not only the alleged debtor's liability but the amount to which he is entitled." First Nat'l Bank of Dalton v. Damil, Inc., 171 Ga.App. 237, 238, 319 S.E.2d 54 (1984).  Once the plaintiff introduces the promissory note, he makes a prima facie case and the burden shifts to the defendant to assert defenses to rebut the plaintiff's evidence.  Id.  If the defendant asserts no viable defenses, liability is established, and the burden shifts back to the plaintiff to prove the amount owed. See id.  "Where there is insufficient competent evidence to enable

27

a jury to calculate with reasonable certainty the sum owed, direction of a verdict against the plaintiff creditor is authorized." Id. (citations omitted).

The August 1, 2001 Promissory Note, for the principal sum of $250,000, is part of the summary judgment record. Under its terms, Profitable Dining was to make principal payments to the plaintiff at the rate of $10,000 per month for twenty-five months with all interest due being paid at the end of the term of the loan or when the principal balance is eliminated, whichever comes first.

Profitable Dining does not dispute the execution of the note. Accordingly, Marsala has made out a prima facie right to judgment in his favor on the note; unless Profitable Dining establishes a defense, which it does.

Profitable Dining insists that its own records "show that the note has been paid." In support of this assertion, it submits two letters sent to Marsala:

On February 14, 2003, Lanners sent Marsala a letter "as a note of explanation as it pertains to the money paid to you last year from Profitable Dining":

> [Y]ou were paid $9000.00 in 2002. Our accounting firm has agreed that these payments should be classified as an "owner's distribution" to you. In doing so, you will not receive a 1099. In addition, you will not have to declare the payments as taxable income.
>
> It is my expectation that you will see an increase in 2003–again–it will not be creating

28

a 1099.

> Should you find a need for "2002 income
> verification" for any of you[r] future
> business dealings, I will be happy to have
> Lisa forward cancelled checks to verify money
> paid to you.

On March 20, 2003, Profitable Dining's Chief Financial Officer sent Marsala a letter "for your records as to what Profitable Dining paid you in 2001: 3 Payments of $700.00 interest[,] 4 payments of $10000.00[,] 1 Payment of $122500.00[.] Total: 164600.00[.]"

Profitable Dining's position is that this correspondence shows that, by March 2003, it had repaid $254,600 to Marsala. Marsala does not disagree. Indeed, he seems to adopt the company's position on repayment, but suggests vaguely that "to the best of my recollection", he is owed something more. In his Declaration attached to his opposition to defendant's motion for summary judgment, he declares in paragraph 31:

> To the best of my recollection, at present
> there is a balance...on my loan to Profitable
> Dining, LLC.... The total amount of loans to
> the best of my recollection is $364,000....
> Defendants claim that I was repaid $254,600
> which means that I am still owed $109,400.

In his papers supplementing his opposition to summary judgment, Marsala amends paragraph 31 of his Declaration based on "recently discovered cancelled checks in his possession" to state that "[t]he total amount of loans to the best of my recollection is $376,500[;]

[d]efendants claim that I was repaid $254,600 which means that I am still owed $121,900.00 plus interest." Marsala does not submit the newly discovered cancelled checks. In any event, Marsala still simply speculates as to some amount owed beyond that already repaid. The Court agrees with Profitable Dining that Marsala cannot prove the amount owed simply by his "best recollection." See id.; see also Development Corp. of Georgia v. Berndt, 131 Ga.App. 277, 205 S.E.2d 868 (1974) (noting that "[t]he question of damages cannot be left to speculation, conjecture and guesswork").

Because the parties do not dispute what has been paid to the plaintiff on the Note, and because the plaintiff has offered no support for his assertion that "something" more is owed, summary judgment is appropriate on this claim. Marsala's claim against Profitable Dining is dismissed.

### VII.   Conclusion

Accordingly, (i) Mayo's motion to amend answer is GRANTED; (ii) Mayo's motion for summary judgment is GRANTED in part and DENIED in part; and (iii) Lanners' and Profitable Dining's motion for summary judgment is GRANTED in part and DENIED in part.[22] Marsala's breach of fiduciary duty claims remain viable. Marsala's

---

[22] The plaintiff notes in his brief that he has just learned through discovery that Lanners also entered into a settlement with GE. Accordingly, he says he is willing to dismiss his contribution claim against Lanners if Lanners is willing to dismiss his contribution cross-claim against him. The contribution claim and cross-claim are hereby dismissed.

fraud claims, with the exception of his claim that defendants made misrepresentations to induce him to sign personal guarantees, are dismissed.  Finally, Marsala's claim against Profitable Dining for money owed on a promissory note is dismissed.

New Orleans, Louisiana, November 2, 2007.

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE